IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| United States of America | Crim. No. 4:07-cr-00787-TLW-1 |
| v. | **ORDER** |
| Shanita McKnight | |

This matter comes before the Court on Defendant Shanita McKnight's *pro se* motion for a sentence reduction under the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A)(i). ECF No. 263. For the reasons below, her motion is **GRANTED.**

## INTRODUCTION

The Court finds it first necessary to address the unique circumstances of this matter. The question before the Court is whether McKnight will be required to *return* to custody in light of her release from incarceration by the Federal Bureau of Prisons ("BOP") on May 28, 2020, as a result of policies implemented by the Attorney General of the United States. This Court had no role in McKnight's May 2020 release by the BOP and will outline the procedures implemented by Congress, the Department of Justice, and the BOP which culminated in her release.

On March 26, 2020, at the start of the COVID-19 pandemic, former Attorney General William Barr issued a memorandum to the Director of the BOP, instructing him to prioritize the release and use of home confinement for inmates at risk of complications from COVID-19. *See United States v. Jackson*, No. CR ELH-17-0264, 2021 WL 75141, at *7 (D. Md. Jan. 7, 2021) (summarizing the BOP's early response to the pandemic). On March 27, 2020, Congress passed, and the President

subsequently signed, the Coronavirus Aid, Relief, and Economic Security ("CARES") Act,[1] which, in relevant part, authorized the Director of the BOP to release inmates who met certain requirements and place them on home confinement, subject to a finding of an emergency by the Attorney General. *Id.* On April 3, 2020, Attorney General Barr issued another memorandum to the Director of the BOP, finding the "the requisite emergency [.]" *Id.* (citations omitted). "Notably, the April 3rd memorandum had the effect of expanding the BOP's authority to grant home confinement to any inmate." *Id.* (cleaned up). The CARES Act, however, authorized the Director of the BOP to place inmates on home confinement "only during the statute's covered emergency period." *United States v. Vannatta*, No. 2:18-CR-0779-DCN, 2022 WL 1570846, at *3 (D.S.C. May 18, 2022) (discussing the potential procedure for returning an inmate on home confinement under the CARES Act to the BOP following conclusion of the covered emergency period). The covered emergency period ends either 30 days after the date the President terminates the national emergency declaration or when the Attorney General revokes the authority given to the Director of the BOP to extend a prisoner's home confinement stay. *Id.* When the covered emergency period expires, "the [BOP] would be required to recall the prisoners to correctional facilities [.]" *Id.* (citing Home Confinement of Federal Prisoners After the COVID-19 Emergency, 45 Op. O.L.C. __ at *1–2 (Slip Opinion), https://www.justice.gov/olc/file/1355886/download (Jan. 15, 2021)).

---

[1] Pub. L. No. 116–136, 134 Stat. 281.

Using the authority authorized by Congress in the CARES Act, the BOP released McKnight to home confinement in Florence, South Carolina on May 28, 2020, obviously now more than three years ago. Her release was based on her significant medical conditions. She was approved by BOP for the Federal Location Monitoring Program while on home confinement, due to her being deemed an inmate at risk of complications from COVID-19. ECF No. 263 at 2. Presently, McKnight remains on home confinement under the CARES Act.

On January 30, 2023, the Biden Administration announced its intent to end the national emergency and public health emergency declarations related to the COVID-19 pandemic on May 11, 2023. *See Statement of Administration Policy*, https://www.whitehouse.gov/wp-content/uploads/2023/01/SAP-H.R.-382-H.J.-Res.-7.pdf (last accessed on July 19, 2023). The Biden Administration's ending of the national emergency set in motion the conclusion of the covered emergency period, which ended on June 29, 2023. Therefore, because the covered emergency period has ended, McKnight faces potential recall to her BOP institution. Thus, the question before the Court is not whether McKnight will be released from BOP custody but whether she will be required to return to custody in light of the intervening circumstances since her release by the BOP and placement on home confinement.

## PROCEDURAL BACKGROUND

On October 21, 2008, McKnight was convicted at trial of two counts: conspiracy to possess with intent to distribute 50 grams or more of cocaine base and

5 kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), 841(b)(1)(A)(iii), and 846 (Count 1); and extortion by a public employee, in violation of 18 U.S.C. § 1951(a) (Count 2). ECF No. 133. The Court imposed a concurrent 240-month (20 years) term of imprisonment on each count, followed by concurrent terms of 5 years and 3 years of supervised release. ECF No. 162.

Following sentencing, McKnight appealed to the United States Court of Appeals for the Fourth Circuit, asserting that she received ineffective assistance of counsel. ECF No. 165. The Fourth Circuit affirmed her conviction and sentence, concluding that her claims of ineffective assistance should be raised by a habeas corpus petition pursuant to 28 U.S.C. § 2255. ECF No. 185. McKnight then filed a § 2255 petition, which this Court denied in a detailed written order. ECF Nos. 187 & 219.

Presently pending before the Court is McKnight's motion for compassionate release, asking that she not be returned to custody, if required to do so by the BOP. ECF No. 263. The Government has outlined its position regarding McKnight's motion, and she has replied to the Government's opposition. ECF Nos. 268 & 272. Accordingly, this matter is now ripe for the Court's review.

## APPLICABLE LAW

Absent certain exceptions, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). One of those exceptions is the compassionate release statute. That statute provides, in relevant part, as follows:

> [T]he court, . . . upon motion of the defendant . . . , may reduce the term of imprisonment . . . after considering the factors set forth in

section 3553(a) . . . , if it finds that—(i) extraordinary and compelling reasons warrant such a reduction; . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A). "A defendant who seeks compassionate release under § 3582(c)(1)(A)(i) has the burden of establishing that such relief is warranted." *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).

The Sentencing Commission has issued a policy statement addressing compassionate release motions—§ 1B1.13. But prior to the passage of the First Step Act, compassionate release motions could only be filed by the Bureau of Prisons ("BOP"), so § 1B1.13 by its terms only applies to BOP motions. *See United States v. McCoy*, 981 F.3d 271, 275–76 (4th Cir. 2020) (explaining the First Step Act's changes to the compassionate release statute). There is no corresponding policy statement addressing compassionate release motions filed by inmates. Thus, in *McCoy*, the Fourth Circuit held that, when considering an inmate's compassionate release motion, § 1B1.13 is not an "applicable policy statement[]." *Id.* at 284. But while § 1B1.13 may not directly apply to an inmate's motion, "it remains helpful guidance." *Id.* at 282 n. 7.

While § 1B1.13 may provide guidance, it is not an "applicable policy statement[]," so "district courts are 'empowered . . . to consider *any* extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *United States v. Zullo*, 976 F.3d 228, 230 (2d. Cir. 2020)) (emphasis in original); *see also United States v. Kibble*, 992 F.3d 326 (4th Cir. 2021). Ultimately, the determination of whether a case presents extraordinary and

compelling reasons warranting a sentence reduction is a question reserved to the sound discretion of the district court.

## DISCUSSION

To provide context to both McKnight's motion and the Court's decision, the Court will first review the offense conduct underlying McKnight's present sentence before reviewing the parties' arguments and conducting its own analysis of the issues at play.

## I. THE OFFENSE CONDUCT AND MCKNIGHT'S INCARCERATION

On June 26, 2007, McKnight was named as one of two defendants in a two count Indictment. *See* Presentence Investigation Report ("PSR") ¶ 1. As noted above, McKnight went to trial and was convicted by a jury on both counts. The Indictment arose out of a joint investigation by federal and state law enforcement agencies into cocaine and crack cocaine distribution, along with misconduct by local law enforcement, in the Lake City, South Carolina area. *Id.* ¶ 6.

At the time of the offense conduct, McKnight was a patrol officer with the Lake City Police Department ("LCPD"). *Id.* ¶ 16. She was not a narcotics investigator. McKnight provided information related to local law enforcement activity to individuals involved in drug activity in exchange for cash payments made to her. *Id.* ¶¶ 10–50. The Court notes that McKnight herself was not involved in the distribution of narcotics as undertaken by those involved in drug distribution.

McKnight was sentenced to 240 months—20 years—imprisonment on May 27, 2009. ECF No. 160. She was originally incarcerated at FCI Coleman Low in

Wildwood, Florida. ECF No. 263 at 2. However, as noted above, McKnight was released from custody by the BOP on May 28, 2020, based on policies and procedures implemented by both the Attorney General and Congress in response to the COVID-19 pandemic. Specifically, she was released due to her serious medical conditions. As noted, this Court had no role in McKnight's release. Presently, she resides in Florence, South Carolina.

## II.    THE PARTIES' ARGUMENTS

The Court will next review the arguments raised by both McKnight and the Government in their various motions, responses, and replies before addressing the merits of McKnight's motion for compassionate release. *See* ECF Nos. 263, 268, 272 & 273.

### A.    *McKnight's Arguments in Support of Her Motion*

McKnight requests that the Court grant her motion for compassionate release and sentence her to time served in light of her release by the BOP pursuant to the procedures established by the Department of Justice and Congress. ECF No. 263 at 1. McKnight asserts that she can establish "extraordinary and compelling reasons" warranting her release based on (1) the threat presented by COVID-19 when coupled with her preexisting medical conditions, Lupus and Legionnaires' disease, and (2) because the 18 U.S.C. § 3553(a) sentencing factors, which the Court is required to apply, weigh in favor of her position that she should not be returned to incarcerated status. *Id.* In support of this second argument, McKnight notes that she is currently employed, had no disciplinary infractions while incarcerated, is an

offender with no prior criminal history, was convicted of a nonviolent offense, and has now served a significant portion of the sentence imposed: she has been in custody approximately 15 years and served over 14 years of her 20 year sentence, specifically, over 11 years in federal prison and over 3 years under home confinement *Id.* at 2; ECF No. 272 at 4.

### B.   *The Government's Opposition*

The Government opposes McKnight's motion on three grounds. *See* ECF No. 268. First, the Government argues that McKnight's motion should be dismissed because she has failed to exhaust her administrative remedies. *Id.* at 8–11. Second, and on the merits, the Government states that McKnight has not met her burden of establishing "extraordinary and compelling reasons" because she has been vaccinated against COVID-19. *Id.* at 11–17. Finally, even if she had met § 3582's "extraordinary and compelling reason" standard, the Government posits that the § 3553(a) factors weigh against granting her relief. *Id.*

## III.   THE COURT'S REVIEW

The Court will first analyze whether McKnight has exhausted her administrative remedies before moving on to whether she has presented "extraordinary and compelling reasons" warranting a reduction in her sentence. Finally, the Court will analyze whether the § 3553(a) factors weigh in favor relief.

### A.   *Exhaustion of Administrative Remedies*

Regarding the filing of her motion, McKnight notes that she "is not currently incarcerated and thus is unable to file an administrative relief seeking

compassionate release." ECF No. 263 at 2. In response, the Government asserts that McKnight's motion must be denied because she has failed to exhaust her administrative remedies. ECF No. 268 at 8–11. The Government argues that she "provides no indication that she has made any effort to notify the BOP of her request for a sentence reduction" and that "she could easily submit one to the BOP officials with whom she interacts while on home confinement." ECF No. 268 at 10.

"By its plain language, § 3582(c)(1)(A) requires defendants to first exhaust administrative remedies or wait thirty days after requesting that the warden of their facility file a motion for a sentence reduction; however, courts have waived this requirement when enforcing it would prove futile." *United States v. Glover*, No. 8:07-CR-00960-JMC-15, 2022 WL 3025753, at *2 (D.S.C. Aug. 1, 2022) (citation and quotations omitted); *Kibble*, 992 F.3d at 330 n.2. Hence, "failure to adhere to 18 U.S.C. § 3582's exhaustion requirement does not jurisdictionally bar the court from weighing the merits of a case." *Glover*, 2022 WL 392573, at * 4 (citing *United States v. Saladino*, 7 F. 4th 120 (2d Cir. 2021)); *see also United States v. Muhammad*, 16 F. 4th 126, 129 (4th Cir. 2021) (concluding that § 3582(c)(1)(A)'s exhaustion requirement is not a jurisdictional bar). Therefore, "[b]ecause § 3582(c)(1)(A) is not a jurisdictional limitation, the exhaustion requirement is a 'claim-processing rule []' and accordingly 'may be waived or forfeited[.]'" *Glover*, 2022 WL 392573, at * 4 (citations omitted). Courts may waive § 3582's exhaustion requirement "when there is no BOP warden to grant relief, or if exhaustion would result in inadequate relief. *Id.*; *see also United States v. Norris*, 458 F. Supp. 3d 383, 386 (E.D.N.C. 2020)

("because he is not at a BOP facility, there is no BOP warden to whom Norris can direct a compassionate relief request."); *Albury v. United States*, 496 F. Supp. 3d 974, 979 (E.D. Va. 2020) ("[A]lthough Petitioner is not yet at a BOP facility, this Court waives the exhaustion requirement. The Petitioner's circumstances support the need for a waiver [because] Petitioner is unable to exhaust his administrative remedies since there is no BOP Warden to whom he can direct a compassionate relief request."); *United States v. Jepsen*, 451 F.Supp.3d 242, 245 (D. Conn. 2020) (granting compassionate release where defendant was in a "Catch-22," in that he was unable to apply to a BOP warden for compassionate release because he was not in a BOP facility).

In this case, the Court finds that it is appropriate to proceed without requiring McKnight to make an administrative filing. Section § 3582 requires that a defendant first make their request for compassionate release to "the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A). Here, McKnight is currently on home confinement under the CARES Act as a result of being released by the BOP. There is thus no "warden of the defendant's facility" for her to request compassionate release from. The Court also notes that in its memorandum, the Government addresses the merits of whether McKnight should be returned to custody in addition to the exhaustion question. Accordingly, for the reasons stated, the Court will waive § 3582's exhaustion requirement in this case.

### B.    *The "Extraordinary and Compelling Reasons" Standard*

The crux of McKnight's motion asserts that her medical conditions, when coupled with the threat of COVID-19, meet § 3582's "extraordinary and compelling reasons" standard. She asserts that she "suffers from (1) Lupus; and (2) Legionnaire's disease, which she contracted while at FCI Coleman." ECF No. 263 at 2. In support of this assertion, McKnight has provided significant medical records detailing these conditions, which the Court has reviewed in detail. ECF No. 272–1.

The Government concedes "that lupus qualifies as an immunocompromised condition [] and Legionnaire's disease qualifies as a chronic lung disease" both of which "qualify as conditions that can make you more likely to get severely ill from COVID-19." ECF No. 268 at 13. Yet, the Government argues that McKnight "no longer presents an 'extraordinary and compelling reason' that could warrant release because she has been vaccinated against COVID-19." *Id.* Attached to the Government's response in opposition is McKnight's COVID-19 Vaccination Record Card, which shows that she received the Pfizer-BioNTech vaccine on March 9, 2021 and April 20, 2021, along with two booster shots on November 29, 2021 and July 19, 2022, respectively. ECF No. 268–1 at 1. Accordingly, the question before the Court is whether McKnight can still establish an "extraordinary and compelling reason" after receiving the vaccine.

Some courts in this district have held that, "[f]or the vast majority of prisoners, the availability of a vaccine makes it impossible to conclude that the risk of COVID-19 is an 'extraordinary and compelling' reason for immediate release."

*United States v. Henry*, No. CR 3:17-00640-MGL-4, 2022 WL 16541161, at *2 (D.S.C. Oct. 28, 2022) (citations omitted); *United States v. Wolfe*, No. 6:18-CR-00582-DCC-1, 2022 WL 1204840, at *5 (D.S.C. Apr. 21, 2022); *United States v. Raap*, No. 8:18-CR-00678-DCC-1, 2021 WL 2328048, at *3 (D.S.C. June 8, 2021). However, these cases generally relate to inmates who either assert COVID-19 as a sole basis for establishing "extraordinary and compelling reasons" or who have minor or common medical afflictions. *See generally United States v. Kelly*, No. CR 0:15-511-MGL-1, 2023 WL 3231490, at *3 (D.S.C. May 3, 2023) (noting that "the availability of the vaccine means that COVID-19 *alone* is generally insufficient to constitute extraordinary and compelling reasons for compassionate release.") (emphasis added). McKnight, though, does not fall into this general category of inmates because she has significant medical conditions, as illustrated by her release by the BOP pursuant to the CARES Act. Thus, the Court must still evaluate whether she can meet § 3582's "extraordinary and compelling reasons" standard based on her asserted medical conditions. In doing so, the Court concludes she in fact meets this standard.

Turning specifically to McKnight's serious medical conditions, the Court concludes these conditions meet the "extraordinary and compelling reason" standard. According to both her motion and her medical records, McKnight suffers from "lupus erythematosus, systemic." ECF No. 272–1 at 3. As noted by other courts when evaluating compassionate release motions, "[s]ystemic lupus erythematosus is an inflammatory connective tissues disease with variable features." *United States v.*

*Sanchez*, No. 18-00140, 2020 U.S. Dist. LEXIS 70802 at *5 (D. Conn. Apr. 22, 2020) (citing *515390 Systemic Lupus Erythematosus (SLE)*, Steadman's Medical Dictionary (2014)). "It is a 'prototype' systemic autoimmune disease, 'characterized by the presence of autoantibodies responsible for immunopathologically tissue lesions." *Id.* In essence, "[i]n this autoimmune disease, the body's immune system becomes hyperactive and attacks healthy tissue." *United States v. Millage*, 464 F.Supp. 3d 1218, 1223 (D. Or. 2020). Treatment often involves the use of corticosteroids, which are used to slow down the immune system's inflammatory response and thus mitigated the body's attack on healthy tissue. *See Treating Lupus with Steroids*, https://www.hopkinslupus.org/lupus-treatment/lupus-medications/steroids/ (last accessed July 17, 2023).

As conceded by the Government and noted by other courts, individuals diagnosed with lupus have compromised immune systems and are thus at a higher risk for severe illness from COVID-19. *Sanchez*, No. 18-00140, at *5; *see also Lupus May Confer Higher Risk of Death From COVID-19*, https://www.medscape.com/viewarticle/960732 (last visited July 17, 2023); *Coronavirus (COVID-19) and Lupus*, https://www.lupus.org/resources /coronavirus-and-lupus (last visited July 17, 2023). "The CDC notes that a person may be immunocompromised because of prolonged use of corticosteroids and other immune weakening medications." *Sanchez*, No. 18-00140, at *5; *see also United States v. Grimm*, No. 08-00064, 2020 U.S. Dist. LEXIS 94683 at *6 (noting that "the CDC includes the use or oral or intravenous corticosteroids or other medicines called

immunosuppressants that lower the body's ability to fight some infections as a condition or treatment that can weaken a person's immune system making them immunocompromised.") (cleaned up).

Here, McKnight's medical records illustrate that her lupus is being treated with a corticosteroid, prednisone. *See generally* ECF No. 272–1. McKnight asserts that, because of her diagnosis and treatment, she is in a "high risk group," as identified by the CDC, and "suffers from significant underlying health issue that make her exceptionally vulnerable to COVID-19" and other diseases. ECF No. 263 at 8–9. She posits that, should she be returned to prison, the "[c]onditions of confinement . . . create an optimal environment for the transmission of contagious disease." *Id.* at 8.

The Court agrees—as did the BOP—that McKnight's status as an immunocompromised person makes her more susceptible to contracting disease while incarcerated, including COVID-19. This point is perhaps best illustrated by her contraction of Legionnaires' Disease while FCI Coleman. Legionnaires' Disease results from a patient's infection with the *Legionella* bacteria, which can result in a serious and occasionally deadly form of pneumonia. *See Legionella (Legionnaires' Disease and Pontiac Fever)*, https://www.cdc.gov/legionella/index.html (last accessed July 17, 2023). In January 2020, prior to her release to home confinement, McKnight contracted Legionnaires' Disease and developed a severe lung infection, which resulted in her being hospitalized for 20 days. ECF No. 272–1 at 39–53. Considering her medical conditions, the Court concludes that COVID-19 vaccination

is not a guarantee that McKnight will not contract COVID-19.

Given the McKnight's status as an immunocompromised person and her history of contracting severe illness while incarcerated, the Court concludes that McKnight's asserted medical conditions meet § 3582's "extraordinary and compelling reason" standard. The Court will next move to consideration of whether the § 3553(a) sentencing factors weigh in favor of McKnight's request for relief.

### C.    *The Court's review of the § 3553(a) factors*

Having found that McKnight has established "an extraordinary and compelling reason" warranting relief under § 3582(c)(1)(A), the Court must next consider the sentencing factors as set forth in 18 U.S.C. § 3553(a) "to the extent they are applicable in deciding whether to exercise its discretion to reduce the defendant's term of imprisonment." *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021) (internal quotations omitted). Section 3553(a) sets forth the following factors:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

  (B) to afford adequate deterrence to criminal conduct;

  (C) to protect the public from further crimes of the defendant; and

  (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for [the offense committed] . . .

(5) any pertinent policy statement . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The Court will address each applicable factor in turn.

### i. _The Nature of the Offense._

McKnight provided information related to local police activity to drug dealers in exchange for money. That was a serious offense. However, she was a patrol officer, not a narcotics investigator, which limited to a degree the access she had to investigative information related to drug distribution. Following her indictment, McKnight was convicted at trial of two non-violent offenses: (1) conspiracy to distribute 50 grams or more of cocaine base and 5 grams or more of cocaine and (2) extortion by a public authority. While these offenses are serious, the Court has reviewed in _significant detail_ the conduct of others involved in the police misconduct and drug trafficking at issue. McKnight played a lesser role than did other individuals. She was held accountable for certain drug amounts, not because she sold or distributed the drugs, but because she aided others who did by providing information to them. In reviewing this factor, the Court finds that nature and circumstances of McKnight's conduct, while serious, do not weigh against release

when considering both the specifics of her conduct as compared to others and the fact that she has been confined for approximately 15 years.

    *ii.*    <u>*History and Characteristics of the Defendant.*</u>

The Court first looks to McKnight's criminal history. Outside of the offenses of conviction, McKnight has *no* criminal history. This is noted in her PSR wherein she received a criminal history score of *zero.* PSR ¶ 58. Few charged in federal court have no criminal history or a criminal history score of zero.

The Court next looks to the risk of recidivism presented by McKnight. Given the fact that she had no criminal history prior to her federal convictions, the Court finds that she is not likely to reoffend. This conclusion is supported by the fact that she received the lowest possible recidivism score of "minimum" on the BOP's "Prisoner Assessment Tool Targeting Estimate Risk and Needs," placing her in the category of inmates least likely to reoffend. ECF No. 263.

The Court next looks to McKnight's conduct while incarcerated. During her approximately 15 years of incarceration, she has had no disciplinary infractions or violations. While incarcerated, she took the initiative to participate in educational programs offered by the BOP. She notes that she completed 62 classes and apprenticeships while incarcerated, including Algebra, Home Construction and Home Inspection, Basic Parenting Skills, and Dealing with Domestic Violence. *Id.*

The Court also looks to the circumstances of McKnight's release to home confinement under the CARES Act and her conduct while under home confinement. This is a significant factor in light of her release by the BOP based on her medical

conditions. In order to be released to home confinement, McKnight was thoroughly vetted by the BOP. *Id.* After her release, she was approved to live in her own residence without a sponsor, where she now serves as the primary caretaker for her adult son with special needs and her mother who has early onset dementia. *Id.*; ECF No. 274. Probation has advised the Court that McKnight has had no violations or issues while on home confinement. Any violations while on home confinement would be fatal to her motion for relief.

Lastly, the Court looks to McKnight's relevant background information. She is a high school graduate who subsequently earned a Bachelor of Science degree in criminal justice from the University of South Carolina at Spartanburg. PSR ¶¶ 88–89. From her college graduation until her indictment for the instant offenses, she was employed by both the Lake City Police Department and the Florence County Sheriff's Office. *Id.* ¶¶ 91–92. McKnight has been employed since August 10, 2020. She is currently employed and began her employment less than three months of being released and placed on home confinement by the BOP. She has received two promotions in connection with her employment while on home confinement. ECF No. 274. Finally, the Court notes that there is no information in the record that McKnight has substance or alcohol abuse issues. PSR ¶ 87.

Based on the Court's extensive review of McKnight's history and characteristics, it concludes that this factor weights in favor of her request for relief.

*iii.*    <u>*The Need for the Sentence Imposed.*</u>

Turning to the next set of factors: the need for the sentence imposed to reflect the seriousness of the offense, to afford adequate deterrence of criminal conduct, and to protect the public from further crimes of the defendant. McKnight was taken into custody after being found guilty nearly 15 years ago, and she has now served over 70% of her 20-year sentence. Given McKnight's confinement for approximately 15 years, her lack of any prior criminal record, and the fact that she has had no violations either while incarcerated or while on home confinement, the Court concludes that these factors weigh in favor of a reduced sentence.

Additionally, the Government argues that McKnight's 240-month sentence "was also necessary to protect the public from further crimes committed by her under § 3553(a)(2)(C)." ECF No. 268 at 19. However, as noted above, prior to her convictions for the instant federal offenses, McKnight had no criminal history. Moreover, during her approximately 12 years of incarceration, she has had no disciplinary infractions. She has been on home confinement for approximately three years and has had no violations or infractions. The BOP has classified her as having a low risk of reoffending, which is supported by the record before the Court. Considering her extensive record of compliance and low risk of recidivism, the Court concludes that it is unlikely that she will commit a violation of criminal law in the future. She does not pose a risk of violence to the public.

    *iv.*    <u>*The § 3353(a) factors weigh in McKnight's favor.*</u>

The Court concludes that the relevant § 3553(a) factors weigh McKnight's favor given that (1) she did not commit a violent offense, (2) she has no prior criminal history, and (3) she has now served over 70% of her sentence, *i.e.*, 14 years of her 20-year sentence (excluding her presentencing incarceration). When coupled with her autoimmune disease, the Court concludes that it is appropriate to grant her request for a sentence reduction under § 3582(a)(1)(A).

<u>CONCLUSION</u>

McKnight has met her burden of establishing "extraordinary and compelling reasons." Moreover, the § 3353(a) factors weigh in favor of relief. In summary, McKnight is a first-time offender who was sentenced to a significant term of imprisonment for a nonviolent offense. She has now served over 70% (approximately 14 of 20 years) of the sentence imposed. Accordingly, for the reasons discussed above, the Court **GRANTS** McKnight's motion for compassionate release.

The Court will impose a sentence of time served in light of McKnight's 15 years in custody and service of over 14 years of her 20-year sentence. She must now begin service of a term of supervised release of 5 years, which will commence on the date of entry of this order. The Clerk is directed to provide a copy of this order to the United States Probation Office.

Within 10 days of receipt of this order, she is directed to report in person to United States Probation Office in the district in which she resides. The record reflects that McKnight currently resides in Florence, South Carolina, where there is

a probation office.[2] Probation is directed to notify the Court if McKnight fails to timely report.

The Court finds it necessary to reiterate the statements it made at McKnight's sentencing in relation to the conditions of her supervision.[3] While on supervised release, McKnight must comply with the mandatory and standard conditions of supervision outlined in 18 U.S.C. § 3583(d) and U.S.S.G. § 5D1.3. The mandatory conditions of supervised release are set forth in paragraph 101 of the PSR. They are:

> (1) The defendant shall not commit another federal, state, or local crime; (2) The defendant shall not unlawfully possess a controlled substance; (3) The defendant shall refrain from any unlawful use of a controlled substance and submit to a drug test within fifteen days of release on supervised release and at least two periodic drug tests thereafter (as determined by the Court). This condition may be ameliorated or suspended as provided in 18 U.S.C. § 3563(a)(5). (Effective only for offenses committed on or after September 13, 1994.); (4) If applicable, the defendant shall cooperate in the collection of a DNA sample from the defendant; and (5) If applicable, the defendant shall register under the Sex Offender Registration and Notification Act and comply with the requirements of that Act.

PSR ¶ 101. This Court incorporates in this order the conditions of supervision in accordance with *Rogers*, 941 F.3d at 291. These are the conditions McKnight will now have to abide by while on supervised release. She is to carefully review these conditions. Probation, in following their normally procedures, will provide her with

---

[2]  The address is: John L. McMillan Federal Building & US Courthouse, 401 West Evans Street, Room 202, Florence, SC 29501. Telephone number: 843-676-3825.
[3]  The Court has reviewed the record and the conditions of supervision outlined at McKnight's sentencing and finds that the Court's discussion of these conditions at the sentencing hearing complied with *United States v. Rogers*, 961 F.3d 291 (4th Cir. 2020).

a copy of the supervised release conditions she is now required to follow. An amended judgment will follow the entry of this order.

**IT IS SO ORDERED.**

_s/Terry L. Wooten_

Senior United States District Judge

August 1, 2023
Columbia, South Carolina